***********
In accordance with the directives of the North Carolina Court of Appeals and upon reconsideration of the evidence of record herein, the Full Commission enters the following Decision and Order:
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. The alleged negligent employees of defendant were at all times relevant to this claim acting within the course and scope of their employment with defendant.
4. If plaintiff sustained damages as a result of negligence on the part of a named employee of defendant, the amount of those damages is $100,000.00.
5. The deposition testimony of Janet Roberts is admitted into evidence.
6. A set of six exhibits including the deposition of Dr. Engel, defendant's responses to discovery, defendant's policies regarding client's rights, annual habilitation plans for James Eugene Austin, James Price's personnel records and James Price's death certificate, collectively marked as Stipulated Exhibit Number Two, are admitted into evidence.
7. The medical records of James Eugene Austin from Dr. Engel and East Carolina University, marked as Stipulated Exhibit Number Three, are admitted into evidence.
 ***********
In accordance with the directives of the North Carolina Court of Appeals and based upon the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. Plaintiff's decedent, James Eugene Austin, (hereinafter, "decedent") was born on February 7, 1956. As a result of illness during infancy, decedent sustained brain damage that left him severely mentally retarded. Decedent had the mental capacity of a five-year old. Decedent lived with his natural parents and a female sibling until he was eleven years of age. At that time, decedent required care and supervision twenty-four hours per day and his family was no longer able to provide this necessary care.
2. As a result of his mental impairment, decedent was unable to speak or make informed decisions. He communicated with grunts and gestures. He was able to eat, dress and toilet independently, although he needed to be reminded periodically to use the men's room.
3. Defendant, Caswell Center, is a state-operated institution providing care and treatment for patients with mental retardation. Defendant is located in Kinston, North Carolina. Caswell Center accepted responsibility for the care and custody of Decedent, James Eugene Austin, on January 17, 1967 when he was 11 years old and remained responsible for his care and custody until the date of his death. Decedent was housed at Caswell Center from January 17, 1967 until February 14, 1977, when defendant transferred him to Cherry Hospital in Goldsboro, North Carolina, another state facility. Cherry Hospital provides psychiatric treatment for individuals with mental retardation who also have a diagnosis of mental illness. Psychiatric care was not available at Caswell Center. Decedent remained in Cherry Hospital until March 1, 1977, when he was returned to Caswell Center.
4. Due to behavioral problems, decedent was again transferred to Cherry Hospital on March 28, 1978. From that date until November 27, 1986, decedent resided on the Cherry Hospital campus. For most of this time, he resided at the "Caswell Annex", which was so named because the majority of patients were transferred there from defendant's facility in Kinston. Decedent was transferred back to Caswell Center in Kinston on November 27, 1986.
5. There is conflicting evidence regarding the dates during which decedent resided at the Caswell Annex. In accordance with the decision of the Court of Appeals (No. COA99-1525), the Commission finds that defendant's verified answers to interrogatories estop defendant from denying its responsibility for decedent's care and custody while he was residing at Cherry Hospital.
6. Decedent was either physically or legally in the custody and care of Caswell Center from January 17, 1967 until the date of his death on July 28, 1993.
7. In 1991, decedent was diagnosed with "full blown" AIDS which caused his death two years later. Decedent had never been previously diagnosed as HIV positive. Decedent's immediate cause of death was pneumonia, which was a consequence of acquired immunodeficiency syndrome (hereinafter AIDS). Decedent contracted HIV by unprotected homosexual activity.
8. AIDS is an infectious disease that is caused by the human immunodeficiency virus (HIV). In 1991 when decedent was examined by Dr. Engel, he exhibited signs of repeatedly having been the receptor of rectal intercourse. This sexual activity was nonconsensual because decedent was mentally incapable of consenting. Decedent's medical records also disclosed injury to his penis in 1985 (blister), 1986 (teeth marks), and 1987 (teeth marks, abrasions).
9. Dr. Jimmy S. Woodall was Director of Caswell Center from 1986 through the date of hearing before the deputy commissioner on March 10, 1997. He testified that Dr. Rick Zahara preceded him in this position The director is responsible for setting the policies and philosophy of the agency and for the implementation of these policies through various supervisors and managers. The director is responsible for all employees.
10. At the time of the hearing before the Full Commission, Dr. William Cromer was Medical Director at Caswell Center. In this capacity, he was responsible for all patients there. He had been employed at Caswell since July, 1982. He had no contact with decedent that he was aware of until 1991. Dr. Cromer knew of the practices and policies at Caswell Center. He was aware of the sexual activity between patients which he described as heterosexual and homosexual.
11. Dr. Cromer testified that Caswell Center was also aware that many of their patients were more predatory than others. The predatory patients preyed on the less aware, or passive patients by engaging in homosexual activity with them. According to Dr. Cromer, some of the sexual activity among patients appeared to be consensual. Dr. Cromer disagreed with Dr. Engel's opinion that plaintiff was repeatedly raped while in the care and custody of Caswell because he believed rape meant the act was nonconsensual and involved violence and he stated that he saw no proof of violence in decedent's case.
12. Dr. Cromer testified that defendant's policy was to intervene, but not prevent sexual encounters. Intervention meant separating and counseling patients on appropriate behavior with the goal of changing their way of thinking.
13. Because decedent functioned at the level of a 5 year old and could not communicate except through grunts and gestures, he was unable to protect himself from sexual assaults of others and thus was completely dependent on his caregivers for his personal safety.
14. Decedent preferred to be alone. He needed to be encouraged and prompted to join in and participate in group activities. He was very hesitant in accepting physical touch from others. He would accept limited touch from select staff with which he was comfortable.
15. Decedent's level of functioning prevented him from understanding his rights, or consenting to sexual activity, or preventing others from preying on him. He could not benefit from counseling and he could not make a conscious decision to engage in consensual sex. He was a victim of homosexual activity from other predatory patients and possibly at least one staffer.
16. Although defendant's policy may have been appropriate for some patients, defendant's policy and practices did not protect decedent or patients like decedent who did not understand the concept of individual rights and therefore could not comprehend that he had the right to be free from sexual assault from other predatory patients.
17. Defendant's policy on sexual encounters among patients was not reasonably designed to protect vulnerable patients like decedent who could not protect themselves.
18. Dr. John A. Bartlett and Dr. Engel, experts in infectious diseases, were of the opinion that decedent had no risk factor for contracting AIDS other than homosexual activity. Dr. Bartlett, defendant's expert witness, was of the opinion that decedent, most likely received passive anal intercourse which was supported by what appeared to be an active rectal herpes infection.
19. Staffer, James Price, who died of AIDS in 1995 was one of decedent's residential attendees. He was in charge of the care of decedent while he was employed at Caswell Center for several years preceding 1991. During his employment with defendant, several staffers reported suspicious behavior which caused them to believe that Price might be engaging in homosexual activities with patients for whom he provided care; however, defendant was not able to substantiate these allegations of sexual abuse of patients against Price.
20. Janet Roberts was Director of Nursing at Caswell Center and had been employed there for 27 years at the time her deposition testimony was taken. Ms. Roberts was asked, "Was there ever anything about James [Austin] that would lead you to believe that he was a target or susceptible to sexual exploitation?" Her response was, "No more so than others that I know of at Caswell."
21. Defendant's written policies guarantee residents such as decedent the right to live in a safe environment, the right to be free from abuse and exploitation, the right to be free from harm, inter alia.
22. Decedent needed staff assistance and supervision to protect him from sexual assault from other patients. Ms. Roberts further testified that Caswell provides care commensurate with need.
23. Defendant was aware that decedent had the mental age of a 5 year old, but the sex urges of an adult. Defendant was also aware based on its own Annual Habilitation Plan that decedent was not mentally capable of understanding his right to be free from sexual assault, abuse or exploitation which made him a candidate for homosexual assault by others. Defendant knew that plaintiff was the victim of sexual assault as early as 1985.
24. Defendant also understood that sexual activity among patients involved the risk of contracting sexually transmitted diseases and that homosexual activity among patients exposed patients to the risk of contracting AIDS.
25. Defendant further was aware that homosexual activity among its male residents was occurring to such an extent that it was "common practice" as Dr. Cromer testified. Defendant was aware prior to 1991 that decedent had Hepatitis B which can be transmitted sexually. Decedent also had rectal herpes which was first diagnosed by Dr. Engel, although it is unclear how long decedent had this condition.
26. Dr. Zahara and Dr. Woodall were responsible for the degree of care provided to patients at Caswell Center which included providing the level of staff supervision needed to protect decedent from reasonably foreseeable harm and instituting and implementing policies and practices that were reasonably calculated to protect a patient with decedent's degree of mental retardation from reasonably foreseeable harm. Caswell Center could reasonably foresee that decedent could not protect himself due to his mental age and condition, but continued to adhere to a policy which amounted to telling decedent he had the right to be free from sexual assault, abuse and exploitation, knowing he could not comprehend.
27. Caswell Center, by and through their Directors, Dr. Zahara and Dr. Woodall, and other responsible administrators breached the duty of care owed to decedent. Their breach of the duty of care owed to decedent was the proximate cause of decedent's contraction of AIDS and his death and constituted negligence.
28. The plaintiff was damaged in the stipulated amount of $100,000.00 from the negligence of defendant.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. In order to establish negligence, plaintiff must establish that defendant owed decedent a duty of care under the circumstances; that actions or omission on the part of one or more named employees of defendant constituted a breach of that duty; that defendant's breach of duty was the proximate cause of decedent's injuries and that plaintiff suffered damages. Cucina v. City of Jacksonville, 138 N.C. App. 99, 102disc review denied, 352 N.C. 588.
2. Defendant had a duty to use reasonable care to protect decedent who was in its care and legal custody from reasonably foreseeable harm considering decedent's mental age and level of dependence on his caregivers. Although the Full Commission was unable to find any North Carolina cases on point, other jurisdictions have addressed this issue. The degree of care owed by an institution to a severely retarded patient, such as decedent, is commensurate with the patient's ability to provide for his own safety. Zophy v. State, 27 A.D.2d 414, 279 N.Y.S.2d 918
(1967). Defendant, through its agents, Dr. Jimmy Woodall, Dr. Rick Zahara and various supervisors and managers, breached its duty to protect decedent from reasonably foreseeable harm and such breach was the proximate cause of decedent's contraction of AIDS and his resulting death. Defendant's conduct constituted negligence.
2. As a result of defendant's negligence, plaintiff was damaged in the amount of $100,000.00.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendant shall pay to plaintiff $100,000.00 in damages.
2. Defendant shall pay the costs of this action.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
BSB:md